08-5504-cv
*In re: Lafarge N. Am., Inc.*

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

August Term 2009

Docket Nos.   08-5504-cv (L); 09-1104-cv (CON); 09-1139-cv (CON);
09-1149-cv (CON); 09-1153-cv (CON)

Argued: November 16, 2009          Decided: March 15, 2010

_____

NEW YORK MARINE AND GENERAL INSURANCE COMPANY,

*Plaintiff-Counter-Defendant-Appellee-Cross-Appellant*,

- v.-

LAFARGE NORTH AMERICA, INC.,

*Defendant-Counter-Plaintiff-Appellant-Cross-Appellee.*

_____

AMERICAN STEAMSHIP OWNERS MUTUAL PROTECTION AND INDEMNITY
ASSOCIATION, INC.,

*Plaintiff-Counter-Defendant-Appellee*,

- v.-

LAFARGE NORTH AMERICA, INC.,

*Defendant-Counter-Plaintiff-Appellant.*

_____

THE NORTHERN ASSURANCE COMPANY OF AMERICA and AMERICAN HOME
ASSURANCE COMPANY,

*Plaintiffs-Counter-Defendants-Appellants-Cross-Appellees*,

NEW YORK MARINE AND GENERAL INSURANCE COMPANY,

*Intervenor Plaintiff-Counter-Defendant-Appellee-Cross-Appellant*,

- v.-

LAFARGE NORTH AMERICA, INC.,

*Defendant-Counter-Plaintiff-Appellant-Cross-Appellee —*

1

*Appellee-Cross-Appellant,*

AMERICAN STEAMSHIP OWNERS MUTUAL PROTECTION AND INDEMNITY ASSOCIATION, INC.,

*Defendant-Appellee.*[*]

_____

Before: MINER and STRAUB, <u>Circuit Judges</u>.[**]

Insured- and insurers-appellants appeal from an order entered on January 29, 2007, and summary judgments entered on October 27, 2008, and February 19, 2009, in the United States District Court for the Southern District of New York (Haight, <u>J.</u>), the court having, <u>inter alia</u>, (1) dismissed all causes of action brought against insurer-appellee, after concluding that the insurer-appellee was not responsible under a liability policy for damages allegedly caused by a breakaway barge that was moored to the insured's facility during Hurricane Katrina; (2) granted the insured the fees and expenses of two of the three law firms it retained, based on a finding that the insurer-appellant's policy permitted insured to take reasonable protective measures to minimize exposure to liability arising from the breakaway barge; and (3) denied insured's motion to transfer and its application for attorneys' fees incurred in connection with motions before the district court.

Affirmed in part, vacated in part, and remanded.

<div style="margin-left:40%">

ANTHONY J. PRUZINSKY, John J. Sullivan, Robert G. Clyne, Hill Rivkins & Hayden LLP, New York, New York, <u>for Lafarge North America, Incorporated</u>.

JOHN A.V. NICOLETTI, Nooshin Namazi, Kevin J.B. O'Malley, Nicoletti Hornig & Sweeney, New York, New York, <u>for The Northern Assurance Company of America and American Home Assurance Company</u>.

DAVID H. FROMM and Michael P. Naughton, Brown Gavalas & Fromm LLP, New York, New York, <u>for New York Marine and General Insurance Company</u>.

JOHN M. WOODS and John R. Stevenson, Clyde & Co. US LLP, New York, New York, <u>for American Steamship Owners Mutual Protection and Indemnity Association, Incorporated</u>.

</div>

MINER, <u>Circuit Judge</u>:

_____

[*] The Clerk of the Court is directed to amend the official caption in this case to conform to the listing of the parties above.

[**] Because the Honorable José A. Cabranes recused himself prior to oral argument, this appeal is being decided by the remaining two members of the panel pursuant to Second Circuit Internal Operating Procedure E(b).

2

Insured defendant-counter-plaintiff-appellant-cross-appellee Lafarge North America, Inc. ("Lafarge"), intervenor and primary-insurer plaintiff-counter-defendant-appellee-cross-appellant New York Marine and General Insurance Company ("NYMAGIC" or the "primary insurer"), and excess-insurers plaintiffs-counter-defendants-appellants-cross-appellees Northern Assurance Company of America ("NACA") and American Home Assurance Company ("AHAC" or, collectively with NYMAGIC, in its additional capacity as excess insurer, and NACA, the "excess insurers"), appeal from an order entered on January 29, 2007, and summary judgments entered on October 27, 2008, and February 19, 2009, in the United States District Court for the Southern District of New York (Haight, J.). The District Court, inter alia, (1) dismissed all causes of action brought against insurer plaintiff-counter-defendant-appellee American Steamship Owners Mutual Protection and Indemnity Association, Inc. (the "American Club" or the "Club"); (2) granted Lafarge the fees and expenses of two of the three law firms it retained without the knowledge or consent of the primary insurer; (3) denied Lafarge's motion for attorneys' fees incurred in defending against the insurers' motions for summary judgment; and (4) denied Lafarge's motion to transfer the American Club action to the United States District Court for the Eastern District of Louisiana. For the reasons that follow, we affirm in part and vacate in part the District Court's judgments.

## I.    BACKGROUND

### A.    Barge ING 4727

On August 29, 2005, Hurricane Katrina made landfall in New Orleans, Louisiana. The levee protecting the Lower Ninth Ward of New Orleans failed during the hurricane, causing the Mississippi River to flood the area. Widespread devastation and death ensued. In the course of the disaster, Barge ING 4727, which was one of hundreds of barges and vessels to break away from their moorings during the storm, came to rest against a house on the land side of the levee.

On September 9, 2005, the Wall Street Journal published an article entitled "Still Unknown: Did a Barge Breach the Levee?" In that article, the Army Corps of Engineers was

3

quoted as stating "that one possible cause of this breach is that [Barge ING 4727] smashed through [the levee]." The article identified Ingram Barge Company ("Ingram") as Barge ING 4727's owner, and Lafarge as the operator responsible for the terminal to which Barge ING 4727 was moored when the hurricane struck. Ingram was quoted as stating that "it would have been the terminal's responsibility to secure [Barge ING 4727] in advance of the storm." Lafarge, which was contacted the day before by the reporter preparing the article, stated only that it was "not yet able to provide additional information regarding the terminal or its related transportation operations." It thus was brought to public attention that Barge ING 4727 may not have been merely a casualty of Hurricane Katrina but in fact may have caused the flooding of the Lower Ninth Ward. Further, the article implied that Lafarge may have failed to properly moor Barge ING 4727 during the storm and that Lafarge was therefore responsible for the devastation to the Lower Ninth Ward.

Lafarge, one of the largest suppliers of construction materials in the United States and Canada, was well aware that the exposure to potential liability created by Barge ING 4727 threatened the existence of the company. Thus, upon receiving the initial inquiry from the Wall Street Journal reporter on September 8, 2005, and thereby first becoming aware of a potential causal connection between Barge ING 4727 and the breached levee, Lafarge retained Goodwin Procter LLP ("Goodwin Procter"), which Lafarge described as "a top law firm with a national reputation [that] had represented [Lafarge] in class action/mass tort and other complex litigation [in the past]." Lafarge also retained Holland & Knight LLP ("H&K"), which, according to Lafarge, had a "prominent maritime investigation and litigation practice." The next day, on September 9, 2005, after being advised by Goodwin Procter about the need for local counsel, Lafarge retained the New Orleans law firm Chaffe McCall LLP ("Chaffe"), which also had a sizable maritime practice. The law firms immediately began their work: "Goodwin [Procter] had primary responsibility for oversight, communication, and all legal issues dealing with potential mass tort liability; H&K had the lead on maritime issues and investigation[;] and Chaffe provided

4

necessary local support." Although Goodwin Procter and Chaffe would continue to remain on the case, H&K was discharged in early 2006 after the firm completed its reports on the initial investigation "into the circumstances of the breakaway [B]arge ING 4727 and the failure of the . . . levee structures."

Meanwhile, on September 9, 2005, Lafarge had notified its primary insurer, NYMAGIC, about Barge ING 4727 and the possibility of claims against Lafarge.[1] At that time, Lafarge advised NYMAGIC only that it had retained H&K. In a facsimile transmission dated September 13, 2005, NYMAGIC responded that it had "set up a file and [would] await further details or other developments." NYMAGIC also noted in the transmission that "we have good counsel in New Orleans, Messrs. Sutterfield and Webb [("Sutterfield")], who we would like to involve should there be any significant claim against [Lafarge] in this matter." It was not until September 20, 2005, that Lafarge notified NYMAGIC that it had retained Goodwin Procter and Chaffe, in addition to H&K. Lafarge never obtained NYMAGIC's prior consent to the appointment of any of these law firms. In a response dated September 22, 2005, NYMAGIC advised Lafarge that "we cannot commit to paying for public relations or lobbying efforts" and that "[f]or defense, we wish to assign one of the Louisiana firms on our 'Panel Counsel' list." The response included the names of six New Orleans law firms, including Sutterfield, specializing in maritime litigation.

Lafarge, however, did not respond to NYMAGIC's offered list of counsel, and it became clear that Lafarge "would not consent to any of the six law firms proposed by NYMAGIC and . . . that they intended to continue to employ Goodwin Proct[e]r, Chaffe . . . and [H&K]." In an e-mail dated September 28, 2005, NYMAGIC advised Lafarge that "[we] can agree to the costs of the experts and surveyors but [we] cannot agree to pay for the three sets of attorneys on the case, none approved by us." In a separate e-mail dated the same day, NYMAGIC also informed Lafarge that "[w]e have decided to appoint Sutterfield & Webb as defense counsel in Louisiana."

---

[1] The communication was made between Lafarge's insurance broker, Willis of New York, Inc., and NYMAGIC's managers in the Mutual Marine Office, Inc. For ease of reference, this opinion will refer to these and similar communications as between Lafarge and NYMAGIC.

Lafarge then instructed Goodwin Procter to "cooperate with Sutterfield and to bring Dan Webb, of that firm, up to speed."

On November 3, 2005, the first action against Lafarge was filed in the United States District Court for the Eastern District of Louisiana. See In re Katrina Canal Breaches Consol. Litig., No. 05-4182, 2008 WL 4401970, at *8 (E.D. La. 2008). The action then was predictably enlarged and rapidly mutated into litigation of substantial magnitude and complexity:

> No fewer than four separate class action complaints have been filed against Lafarge, some with putative classes as large as 40,000 members, seeking damages as high as $100 billion. No fewer than 900 docket entries were made in the Katrina Barge Litigation when it was pending before Chief Judge Berrigan, and no fewer than 16,000 docket entries have been made in the consolidated Katrina Litigation pending before Judge Duval. At least 28 other parties, including insurers as direct action defendants, are or have been co-defendants of Lafarge in the Katrina Barge Litigation.

N.Y. Marine and Gen. Ins. Co. v. Lafarge N. Am., Inc., 598 F. Supp. 2d 473, 495 (S.D.N.Y. 2009) (internal quotation marks and alteration omitted). Although the merits of Lafarge's liability (the "barge litigation") will be adjudicated in the Louisiana District Court, Lafarge's insurers commenced three separate actions giving rise to this appeal in the United States District Court for the Southern District of New York. Id. at 476–78. In those actions, the insurers sought declaratory judgments with respect to issues of coverage under the primary and excess policies. Id.

B.    Lafarge's Insurers

Pursuant to NYMAGIC's primary policy, NYMAGIC paid "the approved legal fees and expenses of Sutterfield & Webb and Lafarge's expert fees and costs." These expenses exhausted the primary policy's limit of $5 million. Under the excess policy issued by the three excess insurers — NYMAGIC, AHAC, and NACA — NYMAGIC paid and continues to pay 40% of the legal fees and expenses billed by Sutterfield and the expenses billed by Lafarge's experts in connection with the barge litigation. The remaining 60% of the fees and expenses are said to be covered under the excess policy by AHAC and NACA, but these two insurers have refused to pay so far. Id. at 490 & n.12. The excess policy issued jointly by the three excess insurers covers

6

Lafarge for liability and expenses up to $45 million and under certain circumstances, $50 million. Neither NYMAGIC, AHAC, nor NACA has approved or paid any of the legal fees and expenses of Goodwin Procter, H&K, and Chaffe. The total legal fees and expenses of these three firms amount to over $10 million as of November 11, 2008. Id. at 490.

In addition to being insured under NYMAGIC's primary policy and the excess policy issued by the three excess insurers, Lafarge also is a member of the American Club, a non-profit mutual insurance association, which provides a "protection and indemnity" policy (the "American Club Policy") for its members. The American Club Policy "cover[s] shipowners and charterers against third-party liabilities arising from the ownership or operation of insured vessels." Thus, in accordance with this general purpose, a list of specific vessels to be insured is identified by Lafarge and incorporated into its Certificate of Entry, a document proving Lafarge's membership with the American Club.

Although Ingram owned Barge ING 4727 — and therefore the barge was not listed as an insured vessel under Lafarge's Certificate of Entry — Lafarge's membership in the American Club included the following special term and condition: "If Lafarge . . . acquires an insurable interest in any vessel . . . through purchase, charter, lease or otherwise, [the American Club Policy will] automatically cover such . . . vessel effective from the date and time [Lafarge] acquires an insurable interest in such . . . vessel." (emphasis added). As explained in more detail below, one of the principal issues at contention in this appeal is whether the term "otherwise" in the American Club Policy includes Barge ING 4727, which Lafarge acquired some interest in pursuant to a Transportation Agreement between Lafarge and the barge's owner, Ingram.

The three separate actions filed in the United States District Court for the Southern District of New York were as follows: First, NYMAGIC sought judgments against Lafarge declaring that (1) NYMAGIC's primary policy did not cover the legal fees earned by Lafarge's counsel, i.e., Goodwin Procter, H&K, and Chaffe, which firms were retained without NYMAGIC's knowledge and consent; (2) NYMAGIC — which asserts that it retained the right

7

under its primary policy to direct the defense of any action against Lafarge — had fulfilled its obligations under the policy; and (3) NYMAGIC is obligated to pay only reasonable fees and expenses relating directly to the defense of the claims against Lafarge. Second, the American Club sought a judgment against Lafarge declaring that the American Club Policy did not cover Barge ING 4727 and that, therefore, the American Club was not obligated to cover any of Lafarge's expenses or liabilities arising from the barge litigation. And third, AHAC and NACA sought judgments against Lafarge and the American Club declaring that (1) the American Club Policy covered Barge ING 4727; (2) AHAC and NACA, as excess insurers, were not obligated to pay until NYMAGIC's primary policy and the American Club Policy were first exhausted;[2] and (3) because NYMAGIC's primary policy did not cover Lafarge's legal fees earned by Goodwin Procter, H&K, and Chaffe, AHAC and NACA also were not liable to reimburse Lafarge for payments to those law firms. Id. at 476–77.

Lafarge moved to transfer the American Club action to the Louisiana District Court; however, that motion was denied on January 29, 2007. See Am. Steamship Owners Mut. Prot. and Indem. Ass'n, Inc. v. Lafarge N. Am., Inc., 474 F. Supp. 2d 474, 482–91 (S.D.N.Y. 2007). Subsequently, NYMAGIC, in its capacity as an excess insurer, was granted leave to intervene as a party plaintiff so that it could assert claims mirroring those in AHAC and NACA's action for declaratory judgment against the American Club and Lafarge. As the District Court observed, "[this] is not surprising, since all three insurers, having subscribed to the Excess Policy, are in the same boat and intent upon bailing it out." Lafarge N. Am., Inc., 598 F. Supp. 2d at 478. Each party then filed motions and cross-motions for summary judgment and, alternatively, in the case of the American Club, a motion to dismiss all claims asserted against it.

C.    The District Court's Decisions on Summary Judgment

On October 27, 2008, the District Court granted the American Club's motion for

---

[2]  In the alternative, AHAC and NACA sought a declaration that they were not obligated to pay until NYMAGIC's primary policy was exhausted and Lafarge, as a self-insurer, paid the full amount of what should have been paid under the American Club Policy.

8

summary judgment against Lafarge, declaring that the American Club has no obligation to provide coverage for the claims asserted against Lafarge in connection with the barge litigation. Reviewing the terms of the Transportation Agreement, which established the conditions of Lafarge's use of Ingram's barges, the District Court concluded that the American Club Policy's provision providing for automatic coverage of insurable interests in any vessel acquired by Lafarge "through purchase, charter, lease or otherwise" did not apply to Ingram's Barge ING 4727.  See Am. Steamship Owners Mut. Prot. and Indem. Ass'n, Inc. v. Lafarge N. Am., Inc., No. 06 Civ. 3123, 2008 WL 4449353, at *8–*9 (S.D.N.Y. Sept. 29, 2008).  According to the District Court:

> Lafarge tells Ingram it needs a cement cargo to be transported from Joppa to New Orleans on a particular date.  Ingram selects from its fleet of barges one to perform the work: it could be the ING4727, or 4726, or 4728, or any other Ingram barge.  Lafarge neither knows [n]or cares.  All it knows is that if all goes well, an Ingram barge will arrive at Lafarge's New Orleans facility to discharge a cement cargo.

Id. at *9.  The court concluded that this arrangement between Lafarge and Ingram did not constitute an acquisition by Lafarge — "through purchase, charter, lease or otherwise" — of an insurable interest in Barge ING 4727.

On February 19, 2009, the District Court (1) granted the American Club's motion for summary judgment and dismissed AHAC, NACA, and NYMAGIC's claims against the American Club, the court having concluded that the American Club Policy, as explained in its October 27, 2008 summary judgment, did not cover Barge ING 4727; (2) granted Lafarge's motion for summary judgment against the excess insurers and declared that they were obligated to cover Lafarge, the court having concluded that the excess insurance policy was triggered because Lafarge properly maintained the American Club Policy and because Lafarge was not a self-insurer; and (3) granted, in part, Lafarge's motion for summary judgment against both the primary and excess insurers and declared that they were obligated to cover the legal fees earned by Goodwin Procter and H&K but not Chaffe.  See generally Lafarge N. Am., Inc., 598 F. Supp. 2d at 481–97.  The court also denied all claims for attorneys' fees in connection with the motions and

cross-motions for summary judgment. Id. at 497. The court directed entry of final judgment pursuant to Federal Rule of Civil Procedure 54(b), see id. at 497–98, and this timely appeal followed.

D. Arguments on Appeal

On appeal, Lafarge, NYMAGIC, AHAC, and NACA argue that the American Club Policy covers Barge ING 4727. Lafarge also challenges the District Court's denial of its motion to transfer venue; the court's determination that the primary and excess policies did not cover the legal fees earned by Chaffe; and the court's refusal to award attorneys' fees in connection with the motions and cross-motions for summary judgment.[3] NYMAGIC, AHAC, and NACA further challenge the District Court's decisions on summary judgment, contending that the court erred in concluding that the excess policy was triggered and that both the primary and excess policies covered the legal fees earned by Goodwin Procter and H&K.

II. DISCUSSION

A. Motion to Transfer to Louisiana District Court

We review a district court's denial of a motion to transfer venue for abuse of discretion. D.H. Blair & Co., Inc. v. Gottdiener, 462 F.3d 95, 105 (2d Cir. 2006). A district court may exercise its discretion to transfer venue "for the convenience of parties and witnesses, in the interest of justice." 28 U.S.C. § 1404(a). Among the factors to be considered in determining whether to grant a motion to transfer venue "are, inter alia: (1) the plaintiff's choice of forum, (2) the convenience of witnesses, (3) the location of relevant documents and relative ease of access to sources of proof, (4) the convenience of parties, (5) the locus of operative facts, (6) the availability of process to compel the attendance of unwilling witnesses, and (7) the relative means

---

[3] Lafarge also demanded a jury trial in the action brought by the American Club, but that demand was stricken by the court in a decision dated August 1, 2008. See Am. Steamship Owners Mut. Prot. and Indem. Ass'n, Inc. v. Lafarge N. Am., Inc., No. 06 Civ. 3123, 2008 WL 2980919, at *1–*2 (S.D.N.Y. Aug. 1, 2008) (concluding that Lafarge did not have a right to a jury in a case brought pursuant to the court's admiralty jurisdiction). Because we affirm the District Court's determination that the American Club Policy does not cover Barge ING 4727, we need not decide whether the District Court erred in striking Lafarge's jury demand.

of the parties." Gottdiener, 462 F.3d at 106–07 (internal quotation marks and alteration omitted).

Here, Lafarge does not contest that the above factors either are neutral or favor the American Club against transferring the case to the Louisiana District Court. Instead, Lafarge argues that the so-called first-filed rule "overshadows all other considerations." Lafarge Reply Br. at 24. Relying much on the rationale of avoiding duplicative litigation that underlies the first-filed rule, Lafarge argues that the District Court abused its discretion because the issue of coverage will not be binding on the Louisiana District Court and will need to be re-litigated in the Louisiana District Court, where the barge litigation is currently underway.

The first-filed rule states that, in determining the proper venue, "[w]here there are two competing lawsuits, the first suit should have priority." Gottdiener, 462 F.3d at 106. The rule is inapplicable when there are "special circumstances." Employers Ins. of Wausau v. Fox Entm't Group, Inc., 522 F.3d 271, 276 (2d Cir. 2008). Special circumstances include manipulative or deceptive behavior on the part of the first-filing plaintiff. Id. In addition to "special circumstances," transfer to the first-filed jurisdiction is also inappropriate when "the balance of convenience favors the second-filed action." Id. at 275 (internal quotation marks omitted). The "balance of convenience" is determined by considering the same factors "considered in connection with motions to transfer venue." Id.

Here, the "special circumstances" exception to the first-filed rule is inapplicable. There is no allegation of deceptive or manipulative behavior by the first-filed plaintiffs in Louisiana. Thus, because "[w]here special circumstances are not present, a balancing of the conveniences is necessary," id. at 276, Lafarge's claim that the first-filed rule "overshadows all other considerations" in this case is incorrect, see id. at 275 ("[T]he first-filed rule is only a presumption that may be rebutted by proof of the desirability of proceeding in the forum of the second-filed action." (internal quotation marks omitted)); see also id. (stating that the convenience factors compose the "centrality" of adjudicating transfer motions). Further, so far as the District Court

11

considered the first-filed rule and balanced the convenience factors, we see no abuse of discretion in the District Court's analysis.

As the District Court noted, among its other observations, the American Club Policy was negotiated and executed in New York, issued by a New York insurer, stipulated to apply New York law, and agreed upon to be litigated in the United States District Court for the Southern District of New York in the event Lafarge brought a claim against the American Club. See Am. S.S. Owners Mut. Prot. & Indem. Ass'n, Inc. v. Lafarge N. Am., Inc., 474 F. Supp. 2d 474, 482–90 (S.D.N.Y. 2007). Thus, the locus of operative facts as well as the interests of efficiency and fairness favor a New York forum. With respect to Lafarge's claim of duplicative litigation, the District Court reasonably determined that the liability and coverage issues in the Louisiana and New York actions, respectively, are not coextensive because resolution as to the liability issues would not necessarily resolve Lafarge's claims against the American Club for defense costs. Id. at 476–77, 486. Moreover, the District Court reasonably relied on Fifth Circuit precedent to conclude that it was unlikely that two inconsistent judgments on the merits would result from the court's denial of Lafarge's transfer motion.[4] See Acosta v. Master Maint. & Constr. Inc., 452 F.3d 373, 377 n.7 (5th Cir. 2006) (stating that an arbitration award may be "persuasive, if not

---

[4] We add that the Louisiana District Court has subsequently stated that it intends to follow the rulings of this Circuit with respect to issues involving coverage:

> [I]t is clear that this entire coverage matter has been and will be adjudicated in New York and in the Second Circuit Court of Appeals in a timely fashion. For reasons of comity and judicial economy, this Court will not undertake a second look at the precise same issues. Such a course of action could potentially wreak havoc and create unnecessary conflicts. [The New York District Court] determined that the first to file rule was not applicable to these disputes and as such, the Court will not take any action to create any potential conflict. Simply put, two federal courts should not be adjudicating the same issues.

In re Katrina Canal Breaches Consol. Litig., No. 05-4182, Section K(2), Order and Reasons (E.D. La. Oct. 9, 2008) (reprinted in the Appendix to the American Club Answering Br.). Lafarge's fear of duplicative litigation, therefore, has less force now as a practical matter.

12

binding," on direct-action plaintiffs who are not parties to the arbitration between defendant-insured and defendant-insurer (emphasis added)). Weighing Lafarge's asserted claims of duplicative litigation, the unlikely event of inconsistent judgments, the various convenience factors, and the interests of justice, the District Court reasonably concluded that transfer was not warranted in light of the totality of the circumstances. Id. at 490.

Lafarge also argues that the District Court applied the wrong standard in evaluating the motion to transfer, namely, that the court erroneously applied the "clear and convincing evidence" standard. Although we have never explicitly approved a district court's use of the "clear and convincing evidence" standard in ruling on a motion to transfer venue, the propriety of that standard to transfer-motions is evident. We have stated that the party requesting transfer carries the "burden of making out a strong case for transfer." Filmline (Cross-Country) Prods., Inc. v. United Artists Corp., 865 F.2d 513, 521 (2d Cir. 1989) (internal quotation marks omitted). It is therefore appropriate that the district courts in our Circuit have consistently applied the clear and convincing evidence standard in determining whether to exercise discretion to grant a transfer motion. See, e.g., Hershman v. UnumProvident Corp., 658 F. Supp. 2d 598, 600 (S.D.N.Y. 2009); MAK Mktg. Inc. v. Kalapos, 620 F. Supp. 2d 295, 298 (D. Conn. 2009); Wagner v. N.Y. Marriott Marquis, 502 F. Supp. 2d 312, 315 (N.D.N.Y. 2007); Neil Bros. Ltd. v. World Wide Lines, Inc., 425 F. Supp. 2d 325, 327 (E.D.N.Y. 2006); Tom & Sally's Handmade Chocolates, Inc. v. Gasworks, Inc., 977 F. Supp. 297, 302 (D. Vt. 1997); United States v. Gen. Motors Corp., 183 F. Supp. 858, 861 (S.D.N.Y. 1960); see also Christina Canada, Inc. v. Wior Corp., 702 F. Supp. 461, 463 (S.D.N.Y. 1988) ("[A]bsent a clear and convincing showing that the balance of convenience favors the ultimate forum, discretionary transfers are not favored." (internal quotation marks omitted)); accord Headrick v. Atchison, T. & S.F. Ry. Co., 182 F.2d 305, 310 (10th Cir. 1950) (holding that under 28 U.S.C. § 1404(a), "the plaintiff's choice of forum [should not be] disturbed[] unless the balance in the defendant's favor is shown by clear and convincing evidence"); cf. In re Horseshoe Entm't, 337 F.3d 429, 434 (5th Cir. 2003).

13

Accordingly, we see no error from which to conclude that the District Court abused its discretion in denying Lafarge's motion to transfer to the Louisiana District Court.

B.    Standard of Review

"We review a grant of summary judgment de novo, construing the evidence in the light most favorable to the non-moving party and drawing all reasonable inferences in its favor." Palmieri v. Allstate Ins. Co., 445 F.3d 179, 187 (2d Cir. 2006). Summary judgment is appropriate "when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law." Id.; see also Fed. R. Civ. P. 56(c). In the context of an action predicated on a contract dispute, summary judgment is generally inappropriate where the contested contractual language is ambiguous. Palmieri, 445 F.3d at 187. The district court's determination of whether a contractual provision is ambiguous is a question of law that we review de novo. Id.; see also ReliaStar Life Ins. Co. of N.Y. v. Home Depot U.S.A., Inc., 570 F.3d 513, 517 (2d Cir. 2009) (per curiam). See generally Palmieri, 445 F.3d at 187 ("Ambiguity resides in a writing when — after it is viewed objectively — more than one meaning may reasonably be ascribed to the language used." (quoting Thompson v. Gjivoje, 896 F.2d 716, 721 (2d Cir. 1990))).

It is undisputed that New York law applies in our examination of the various insurance policies at issue in this case. And "[u]nder New York law, the question of ambiguity . . . must be determined from the face of the agreement, without reference to extrinsic evidence." Collins v. Harrison-Bode, 303 F.3d 429, 433 (2d Cir. 2002) (footnote omitted). "Once a court concludes that an insurance provision is ambiguous, the court may accept any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract." Parks Real Estate Purchasing Group v. St. Paul Fire & Marine Ins. Co., 472 F.3d 33, 43 (2d Cir. 2006) (internal quotation marks omitted).

Although a determination that a contract is ambiguous ordinarily requires denial of summary judgment, the court may nonetheless grant summary judgment where the extrinsic evidence illuminating the parties' intended meaning of the contract is "so one-sided that no

14

reasonable person could decide to the contrary." Compagnie Financiere De Cic Et De L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 232 F.3d 153, 158 (2d Cir. 2000) (Sotomayor, J.) (internal quotation marks omitted). Similarly, summary judgment may be granted despite any ambiguities in the contract "where there is no extrinsic evidence that would support a resolution of [the] ambiguities in favor of the nonmoving party's case." Topps Co. v. Cadbury Stani S.A.I.C., 526 F.3d 63, 68 (2d Cir. 2008). These apparent exceptions merely reinforce the principle that the lynchpin of a summary judgment determination is, in most cases, the existence vel non of genuine issues of material facts. See, e.g., AD/SAT, Div. of Skylight, Inc. v. Associated Press, 181 F.3d 216, 226 (2d Cir. 1999).

C.    The American Club Policy

Barge ING 4727 appears nowhere on Lafarge's list setting forth the vessels to be covered by the American Club Policy. Nonetheless, it is argued that Barge ING 4727 is automatically covered pursuant to the following provision of the American Club Policy (the "Chartered Barges Clause"):

> If Lafarge . . . acquires an insurable interest in any vessel in addition to or in substitution for those set forth herein, through purchase, charter, lease or otherwise, such insurance as is afforded hereunder to any similar vessel shall automatically cover such additional vessel effective from the date and time [Lafarge] acquires an insurable interest in such additional vessel. With respect to a chartered, leased or similarly acquired vessel, the insurance hereunder automatically includes the owner as an additional Assured with waiver of subrogation against the owner, if required, effective from the date and time such vessel is insured hereunder. (emphasis added).

Lafarge argues that it acquired an insurable interest in Barge ING 4727 "through purchase, charter, lease or otherwise" and, therefore, that Barge ING 4727 is covered under the American Club Policy.[5] Specifically, Lafarge argues that it acquired an insurable interest in Barge ING 4727 by means "otherwise" via the Transportation Agreement with Ingram, which

---

[5] NYMAGIC, AHAC, and NACA also take the position that the American Club Policy covers Barge ING 4727. Although we refer only to Lafarge in the text of the opinion for ease of reference, in doing so we address all arguments for coverage made by Lafarge, NYMAGIC, AHAC, and NACA.

15

purportedly conferred upon Lafarge the status of bailee of Ingram's Barge ING 4727. Lafarge insists that the term "otherwise" must be given its dictionary meaning, i.e., "in any other manner." According to Lafarge, any insurable interest in a vessel — be it acquired by Lafarge through purchase, charter, lease, or, in the alternative, "regardless of how acquired," Lafarge Reply Br. at 4 (emphasis added) — is automatically covered under the plain terms of the Chartered Barges Clause.

As Lafarge notes, we have in other contexts read "otherwise" literally and construed provisions containing that term to mean an assurance of comprehensiveness. See, e.g., Greene v. United States, 79 F.3d 1348, 1355 (2d Cir. 1996) ("When § 1256 lists several types of terminations and follows those with the words 'or otherwise,' the statute necessarily brings transfers of all kinds within its compass. The statute does not say 'or other similar terminations,' nor does it limit in any way the words 'or otherwise.'"); Dunham v. Omaha & Council Bluffs St. Ry. Co., 106 F.2d 1, 3 (2d Cir. 1939) ("The words 'or otherwise' following 'any suit or proceedings in equity' can only enlarge the reference to the form of action to include any other suit or proceedings . . . . 'Otherwise' means, 'In a different manner; in another way, or in other ways.'"). In contrast to Green and Dunham, however, here, the structure of the Chartered Barges Clause and the provisions of the American Club Policy counsel against applying a literal interpretation of the term "otherwise." See JA Apparel Corp. v. Abboud, 568 F.3d 390, 405 (2d Cir. 2009) (stating that in examining a contract, the court considers "the context of the entire integrated agreement," as well as "the customs, practices, usages and terminology as generally understood in the particular trade or business" (internal quotation marks omitted)).

The American Club is a "Steamship Owners Mutual Protection and Indemnity Association," and in accordance with that general purpose, the American Club Policy requires members to provide a list of their vessels to be entered with the Club. As a special condition, the Chartered Barges Clause permits automatic coverage under the American Club Policy to Lafarge in the event it "acquires an insurable interest in any vessel in addition to or in substitution for

16

those set forth herein, through purchase, charter, lease or otherwise." In considering the Chartered Barges Clause, we find it significant that it automatically covers vessels that are "in addition to or in substitution for those set forth herein," i.e., vessels owned by Lafarge and that are part of the "Lafarge fleet." See Lafarge N. Am., Inc., 2008 WL 4449353, at *2. This provides the appropriate context for interpreting the phrase that immediately follows, "through purchase, charter, lease or otherwise," which essentially describes the way in which a substantial interest akin to the interest in the vessels "set forth herein" may be acquired. The phrase "through purchase, charter, lease or otherwise," therefore, reasonably signifies a limiting precept rather than an assurance of comprehensiveness.

Indeed, interpreting "otherwise" literally would result in a substantial modification of the Chartered Barges Clause. If "otherwise" were to be interpreted as literally as Lafarge contends, then the Chartered Barges Clause need not have required that an insurable interest in a vessel be acquired "through" any particular type of transaction in the first place. In fact, the Chartered Barges Clause need not even have referred to the acquisition being "in addition to or in substitution for" the vessels that make up the Lafarge fleet. Rather, the Chartered Barges Clause need only have stated that coverage is warranted for any vessel in which Lafarge has an insurable interest. Thus, by literally construing the term "otherwise," Lafarge effectively guts two entire phrases from the Chartered Barges Clause. Lafarge's approach to interpreting the term "otherwise" therefore violates the fundamental rule of contract interpretation that "a court must strive to give meaning to every sentence, clause, and word." See Zurich Am. Ins. Co. v. ABM Indus., Inc., 397 F.3d 158, 165 (2d Cir. 2005) (internal quotation marks omitted) (quoting Travelers Cas. & Sur. Co. v. Certain Underwriters at Lloyd's of London, 96 N.Y.2d 583, 594 (2001)).

Lafarge refers to a different sentence in the Chartered Barges Clause providing for coverage of third-party owners "[w]ith respect to a chartered, leased or similarly acquired vessel." Lafarge contends that the Chartered Barges Clause would have used the same language, i.e., "or

17

similarly acquired vessel," had the parties intended "otherwise" to be limited to transactions akin to charters, leases, or purchases. Lafarge asserts that "otherwise" therefore "should be interpreted here to broaden the scope of coverage available under the Chartered Barges [C]lause to the same extent as though all possible methods of acquiring an insurable interest in a vessel had been included by name." AHAC & NACA Opening Br. at 31. This logic, however, does not explain or address the modification of the Chartered Barges Clause that would result from the elimination of the limiting phrase altogether, were we to adopt Lafarge's literal definition of "otherwise." See Cent. Hanover Bank & Trust Co. v. Comm'r of Internal Revenue, 159 F.2d 167, 169 (2d Cir. 1947) (Learned Hand, J.) ("There is no more likely way to misapprehend the meaning of language — be it in a constitution, a statute, a will or a contract — than to read the words literally, forgetting the object which the document as a whole is meant to secure."). See generally Robert T. Lemon II, Allocation of Marine Risks: An Overview of the Marine Insurance Package, 81 Tul. L. Rev. 1467, 1480–81 (2007) ("The P&I [Protection and Indemnity] policy is not a comprehensive general liability policy, for it does not purport to cover all types of an insured's liability . . . .").

Lafarge also refers to Rule 2 of the American Club Policy, which provides that a member of the American Club "shall be indemnified in connection with each vessel . . . against any loss, damage or expense which the Member shall become liable to pay and shall pay by reason of the fact that the Member is the owner (or operator, manager, charterer, mortgagee, trustee, receiver or agent, as the case may be) of the insured vessel." (emphasis added). Lafarge contends that "because the Club's Rules included all sorts of methods for acquiring an insurable interest other than — and different from — a purchase, charter, or lease, the phrase 'or otherwise' in the Certificate of Entry must likewise be construed in that broad manner." Lafarge Opening Br. at 42. But Rule 2 is a finite list of relationships and does not support Lafarge's claim that, under the Chartered Barges Clause, an insurable interest in a vessel can be acquired by any means.

Furthermore, Lafarge argues that the term "otherwise" must be read literally to encompass

any and all transactions because there are "no means of acquiring an interest in a vessel that are similar to a purchase, charter, or lease but not already encompassed within the words 'purchase,' 'charter,' or 'lease.'" Lafarge Opening Br. at 45. To the extent a vessel may be "hired" or "rented," Lafarge argues that those terms are synonyms of "charter" and "lease" and that interpreting "otherwise" to mean all synonyms for "purchase, charter, [or] lease" would render "otherwise" superfluous. According to Lafarge, therefore, reading "otherwise" as akin to purchase, charter, or lease would read out "otherwise" entirely. While Lafarge does make a reasonable argument in this regard, we note that the authorities cited by Lafarge to support the proposition that "arguably . . . synonymous . . . terms should be treated as mutually exclusive, rather than as synonyms," see, e.g., S. Axelrod Co. v. Mel Dixon Studio, Inc., 471 N.Y.S.2d 945, 951 (Civ. Ct. 1983), do not involve situations where a reasonably discernable intent of the contract would be rendered a nullity if we were to follow the rule to the letter.[6]

We are therefore unpersuaded that "otherwise" cannot reasonably be construed to mean a narrow category of commercial conducts akin to a purchase, charter, or lease. Nonetheless, be that as it may, we are unable to conclusively determine from the face of the American Club Policy a single plain meaning of the Chartered Barges Clause. And in this regard, we find error in the District Court's determination to the contrary. This error was inconsequential, however, because there are no genuine issues of material facts in this case that would support the application of a literal reading of the term "otherwise" in the Chartered Barges Clause.[7] See generally In re

---

[6] Moreover, while not advanced by the American Club, we note the possibility that a vessel may be bequeathed to Lafarge pursuant to a will, donated to Lafarge pursuant to a trust, or adopted by Lafarge pursuant to an equal merger with another company. None of these circumstances appear to constitute a "purchase, charter, [or] lease," but these examples provide meaning to "otherwise" that survive Lafarge's test of synonyms.

[7] Because we affirm the District Court's decision on other grounds, we need not address the propriety of its use of ejusdem generis to make a plain meaning determination of the Chartered Barges Clause. But cf. United States v. Turkette, 452 U.S. 576, 581 (1981) ("The rule of ejusdem generis is no more than an aid to construction and comes into play only when there is some uncertainty as to the meaning of a particular clause in a statute."). Moreover, rules of contract interpretation need not be applied unless "the extrinsic evidence does not yield a conclusive answer as to the parties' intent." Parks Real Estate Purchasing Group v. St. Paul Fire

19

*Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 488 F.3d 112, 134 (2d Cir. 2007) ("[A]n appellate court is free to affirm a district court decision on any grounds for which there is a record sufficient to permit conclusions of law, even grounds not relied upon by the district court." (internal quotation marks omitted)).

Although the record does not clearly inform us of the precise limits of the term "otherwise," it is absolutely clear what "otherwise" is not: "otherwise" does not include the kind of relationship associated with a shipowner's bailment to a terminal operator — the relationship Ingram had with Lafarge for Barge ING 4727. See generally *Dow Chem. Co. v. Barge UM-23B*, 424 F.2d 307, 311 (5th Cir. 1970) (A terminal operator, or "wharfinger," is a "bailee for hire [that is] required to see to it that the barges were adequately moored at all times."); *Am. River Transp. Co. v. Paragon Marine Servs., Inc.*, 213 F. Supp. 2d 1035, 1059 (E.D. Mo 2002) ("The operator of a fleeting facility as bailee has the responsibility of caring for a barge after it is committed to its custody."); accord *Burns Bros v. Long Island R.R. Co.*, 176 F.2d 406, 409 (2d Cir. 1949).

Lafarge's insurance broker, Joanne Fedchin, stated at her deposition that the Chartered Barges Clause was not intended "to insure a third-party's barge that was simply delivering cargo to a [Lafarge] facility." Rather, the Chartered Barges Clause was added at the insistence of Lafarge "for ease of business" by permitting automatic coverage of barges that Lafarge was chartering "for very short periods of time and . . . on a fairly regular basis." Indeed, in a facsimile transmission dated April 14, 1999, Ms. Fedchin wrote to the American Club that Lafarge "charters barges in from time to time — sometimes for a 2 week period, sometimes for a few days"; confirmed that these charters were automatically covered under the American Club Policy; and enclosed a proposed clause, which would ultimately be incorporated into the American Club Policy as the Chartered Barges Clause, consistent with Lafarge's aims. Ms. Fedchin further testified as to the logic behind her understanding of the Chartered Barges Clause as not covering liabilities incurred by Lafarge as a terminal operator: "There is a separate policy that was placed

& Marine Ins. Co., 472 F.3d 33, 43 (2d Cir. 2006) (internal quotation marks omitted).

20

for La[f]arge to cover their miscellaneous marine liabilities, including this exposure which goes by a variety of names for the purposes here. I'll just use one. Wharfingers liability."

In accord with Ms. Fedchin's testimony is Lafarge's conduct, which evinces an understanding that third-party barges such as Barge ING 4727 are not covered under the Chartered Barges Clause. "Conduct of the parties provides another important source for deriving their intent as to the meaning of the insurance contracts at issue. . . . '[T]here is no surer way to find out [the intent of the parties to a contract] . . . than to see what they have done.'" Am. Home Prods. Corp. v. Liberty Mut. Ins. Co., 565 F. Supp. 1485, 1503 (S.D.N.Y. 1983) (quoting Brooklyn Life Ins. Co. v. Dutcher, 95 U.S. 269, 273 (1877)); see also City of N.Y. v. N.Y. City Ry. Co., 193 N.Y. 543, 548 (1908) ("When the parties to a contract of doubtful meaning, guided by self-interest, enforce it for a long time by a consistent and uniform course of conduct, so as to give it a practical meaning, the courts will treat it as having that meaning . . . .").

Here, pursuant to the Chartered Barges Clause, any declarations and premiums for unlisted vessels would have been due annually. Lafarge never declared or tendered any premiums for the over 3,000 third-party owned barges that had passed through its terminals for nearly seven years since Lafarge had become a member of the American Club. Nor is there evidence that the American Club ever demanded premiums for these third-party barges. It was only after the commencement of the barge litigation that Lafarge attempted to satisfy at once its declarations and premiums for the thousands of third-party barges that passed through its terminals for the past seven years. Lafarge's inaction is strong evidence that third-party barges were never intended to be covered by the Chartered Barges Clause, and that inaction is not ameliorated by Lafarge's subsequent assertion of coverage that was, as the District Court aptly observed, "transparently tactical."[8] Lafarge N. Am., Inc., 2008 WL 4449353, at *10.

---

[8] Indeed, in an assertion by the American Club that is not refuted by Lafarge, Lafarge initially attempted to tender the premium for only Barge ING 4727 in the amount of $852 after the commencement of the barge litigation. It was not until two years later that Lafarge attempted to tender the premiums for the over 3,000 other similar barges to bring its conduct in line with its legal claims. American Club Answering Br. at 52–53.

Lafarge only challenges the credibility of Ms. Fedchin's testimony and does not bring forth other evidence that would genuinely place into question her understanding of the intent of the Chartered Barges Clause.[9] Nor does Lafarge offer an explanation, other than that it was an "oversight," for its decision not to declare or pay any premiums for third-party vessels until it became tactically desirable to do so after Hurricane Katrina.[10] Cf. Topps Co., 526 F.3d at 68 (Summary judgment is appropriate "where there is no extrinsic evidence that would support a resolution of [the] ambiguities in favor of the nonmoving party's case."). Instead, Lafarge argues that it was the "operator" of Barge ING 4727 and not simply a wharfinger acting as the bailee of the barge. Lafarge contends that the strength of the evidence showing that it had operational control over Barge ING 4727 warrants summary judgment in Lafarge's favor or, at a minimum, raises sufficient issues of fact such that summary judgment is inappropriate.

Although the Transportation Agreement between Lafarge and Ingram contemplates some control by Lafarge over Ingram's barges for purposes of unloading cargo or shifting barges within its terminal, the agreement states that "[n]othing contained in this Contract shall be construed as a contract by [Lafarge] for the chartering, hiring or leasing of any barge[, and] . . . [Lafarge] shall exercise no control over the operation of any barge." (emphases added). This language

---

[9] Although one of Lafarge's risk managers testified at his deposition that the Chartered Barges Clause is read broadly to cover Lafarge's acquisition of any insurable interest in a vessel, the manager testified as to his understanding of the text of the Chartered Barges Clause and not the intent of the Chartered Barges Clause. Indeed, it appears from the record that the manager did not recall the Chartered Barges Clause at all; rather, at his deposition, he interpreted the text of the clause de novo. Similarly, according to the citation provided by Lafarge, Lafarge's other risk manager merely testified that he had directed his brokers to "always obtain the broadest coverage possible" and did not state that the intent of the Chartered Barges Clause was to cover any and all insurable interests acquired by Lafarge. These testimonies are insufficient to raise genuine issues of material fact. See Nora Beverages, Inc. v. Perrier Group of Am., Inc., 269 F.3d 114, 124 (2d Cir. 2001) (noting, in the context of an infringement action, that summary judgment was appropriate because "de minimis evidence [is] insufficient to raise triable issues").

[10] Lafarge argues that its oversight is "not at all uncommon" because insureds ordinarily forget to pay premiums until losses are incurred and because insurers should "be happy to have the premium." Even if that were true, Lafarge's failure to pay premiums for the thousands of third-party barges, which had passed through its terminals for seven years, demonstrates that Lafarge's failure to pay was not a simple oversight but, rather, strong evidence that Lafarge never expected third-party barges to be covered under the Chartered Barges Clause. See supra note 8.

22

articulates the opposite condition of the Chartered Barges Clause, which requires that a qualifying vessel be acquired "through purchase, charter, lease or otherwise" to establish automatic coverage. Lafarge's "acquisition" of Barge ING 4727, therefore, falls outside the provisions of the Chartered Barges Clause.

Moreover, it is undisputed that Lafarge first contacted Ingram's subcontractor to move Barge ING 4727; having received no reply, Lafarge called a towing company to move Barge ING 4727 in preparation for the landing of Hurricane Katrina. See In re Ingram Barge Co., No. 05-4419, 2008 WL 906303, at *1–*2 (E.D. La. Mar. 31, 2008). Whatever insurable interest Lafarge acquired in Barge ING 4727 through its control of the vessel under these extenuating circumstances, it was not — nor was it akin to — an acquisition of the vessel through purchase, charter, or lease. It also cannot be broadly said that Barge ING 4727 was acquired "in addition to or in substitution for" a vessel in Lafarge's fleet. As the District Court summarized the relationship between Lafarge and Ingram: "Lafarge tells Ingram it needs a cement cargo to be transported[,] . . . . Ingram selects from its fleet of barges one to perform the work[, and] . . . . Lafarge neither knows [n]or cares [which one of Ingram's barges] . . . arrive at Lafarge's New Orleans facility to discharge [the] cement cargo." Lafarge N. Am., Inc., 2008 WL 4449353, at *9. The District Court's observation confirms the relationship between Lafarge and Ingram that, in practice as well as in agreement, Barge ING 4727 was never imagined to be "in addition to or in substitution for" a vessel in Lafarge's fleet or otherwise contemplated by the Chartered Barges Clause as a covered vessel.

In view of the foregoing, although the Chartered Barges Clause is ambiguous, we hold that summary judgment in favor of the American Club is warranted given (1) the strength of the extrinsic evidence that the Chartered Barges Clause was never intended to cover third-party barges such as Barge ING 4727; (2) the lack of any evidence as to a contrary intent that raises genuine issues of material fact; and (3) the Transportation Agreement's express articulation of the relationship between Ingram's barges and Lafarge as outside the conditions of the Chartered

23

Barges Clause. See Merrill Lynch, Pierce, Fenner & Smith, Inc., 232 F.3d at 158; Topps Co., 526 F.3d at 68.

D.    Legal Fees Covered by the Primary Policy

The resolution of whether NYMAGIC's primary policy covers the legal expenses earned by Goodwin Procter, H&K, and Chaffe — the three firms retained by Lafarge without notice to, or consent from, NYMAGIC — lies in applying two provisions of the primary policy. The first provision states that NYMAGIC has the option to name mutually acceptable attorneys who will represent Lafarge in any policy-related litigation between Lafarge and third parties (the "Naming Clause"):

> [NYMAGIC], in consideration, in consultation with [Lafarge], shall have the option of naming any mutually acceptable attorneys who shall represent [Lafarge] in the prosecution or defense of any litigation or negotiations between [Lafarge] and third parties concerning any claim based on a liability or an alleged liability covered by [the primary] policy, and shall have the direction of such litigation's [sic] or negotiations.

The second provision states that Lafarge is obligated to take steps to protect its own and NYMAGIC's interests in respect to any occurrence that is likely to give rise to a claim under the primary policy (the "Protection Clause"):

> [I]n respect of any occurrence likely to give rise to a claim under this policy, [Lafarge] is obligated to and shall take such steps to protect [its] and/or [NYMAGIC's] interests as would reasonably be taken in the absence of this or similar insurance.

On the one hand, NYMAGIC contends that, pursuant to the Naming Clause, it has the right to name mutually acceptable attorneys for Lafarge's defense in the barge litigation; that in exercising its right to specify counsel, NYMAGIC reasonably offered Lafarge to choose from a panel of six qualified law firms; that Lafarge breached its duty of good faith by ignoring NYMAGIC's offered list of counsel; that Goodwin Procter, H&K, and Chaffe were retained by Lafarge without NYMAGIC's knowledge or consent; and that NYMAGIC, which has fulfilled its obligation under the Naming Clause by appointing Sutterfield for Lafarge's defense, is not obligated to pay for the legal fees earned by the three unauthorized law firms.

24

Lafarge, on the other hand, contends that it took reasonable steps pursuant to its obligations under the Protection Clause. Lafarge asserts that it immediately retained qualified counsel to preserve evidence, investigate the cause of the breached levee, and minimize exposure to liability; that the three firms worked in different capacities and did not duplicate each others' work; and that the Protection Clause, in light of the exceptional circumstances of Hurricane Katrina, trumped the provisions of the Naming Clause. Furthermore, Lafarge asserts that even if the Naming Clause applied, NYMAGIC acted in bad faith by failing to investigate the case, refusing to explain its rejection of Lafarge's choice of counsel, and offering an inadequate list of firms to represent Lafarge in the barge litigation. Lafarge also asserts that NYMAGIC is precluded from exercising its rights under the Naming Clause because the interests in the litigation between Lafarge and NYMAGIC are in conflict.

Thus, according to Lafarge, the District Court erred because the primary policy covered not only Goodwin Procter and H&K, but also Chaffe, as the retainer of all three law firms was reasonable and required under the Protection Clause. According to NYMAGIC, the District Court erred because the primary policy covers neither Goodwin Procter, H&K, nor Chaffe, as all three firms were retained without NYMAGIC's knowledge or consent and in violation of the Naming Clause. Each party emphasizes one clause and minimizes the importance of the other. We think it plain that both provisions must be given full effect. See Chapman v. N.Y. State Div. for Youth, 546 F.3d 230, 236 (2d Cir. 2008) ("A contract should be construed so as to give full meaning and effect to all of its provisions." (internal quotation marks omitted) (quoting Am. Express Bank Ltd. v. Uniroyal, Inc., 562 N.Y.S.2d 613, 614 (App. Div. 1990))).

Lafarge is correct that in light of the exceptional circumstances of Hurricane Katrina, it was reasonable to act quickly to retain Goodwin Procter, H&K, and Chaffe to preserve evidence, investigate the cause of the breached levee, and minimize exposure to the damages that would be at stake in the foreseeable and inevitable lawsuits. Considering the level of complexity of the case in both procedural and substantive respects, as well as the possibility of being cast in damages that

25

could exceed the value of Lafarge several times over, we agree with the District Court that "it was reasonable for Lafarge to retain at once a large firm such as Goodwin, with complex case and mass tort experience, to take immediate control of Lafarge's defense against the anticipated litigation flood (which in fact materialized). It was also reasonable for Lafarge to retain an admiralty firm such as H&K, with experience in the 'rapid response' investigation and evaluation of major marine casualties." Lafarge N. Am., Inc., 598 F. Supp. 2d at 493.

In particular, with respect to H&K and Goodwin Procter's early engagement of a recognized maritime expert to "quickly assemble[] a team of experts in disciplines such as hydrology and soil science, and travel . . . with his team to New Orleans" in order to "investigate the barge breakaway and the allegations that the barge had caused the failure of the . . . levee," id., the selection and engagement of the expert was also reasonable. "[T]rial lawyers and claims adjusters know that the prompt identification and preservation of evidence — physical, documentary, and testamentary — after a major casualty is vital. . . . [E]vidence . . . could be lost or compromised if not garnered quickly and preserved carefully." Id. at 494. With respect to Chaffe, "[t]here is no dispute that Lafarge requires local representation by a Louisiana firm well versed in admiralty law," and thus, it was reasonable to retain local counsel, Chaffe, in addition to Goodwin Procter and H&K. Id. at 495.

The primary policy's provision requiring NYMAGIC to pay expenses related to "defending and/or investigating" in connection with claims arising under the primary policy (the "Expense Clause") also informs the policy's coverage of Goodwin Procter, Chaffe, and, in particular, H&K's investigative services. The Expense Clause requires

> [NYMAGIC] to pay survey and related expenses reasonably incurred by [Lafarge] and the legal cost and expense of defending and/or investigating and/or conducting proceedings to limit liability on any suit or claim against [Lafarge] based on a liability or an alleged liability coming within the scope of [the primary policy] . . . but [NYMAGIC] shall not be liable for the cost or expense of defending any suit or claim unless said cost or expense shall have been incurred with the written consent of [NYMAGIC]. [NYMAGIC], however, reserves the right to conduct the defense of any actions or suits at its own expense.

(emphasis added). Here, H&K was retained for investigative purposes — and not as defense

26

counsel — and was discharged following the conclusion of its investigation on the cause of the breached levee. And although the Expense Clause conditions payment on NYMAGIC's written consent, Lafarge had apprised NYMAGIC of its retention of H&K in Lafarge's first notification to NYMAGIC about the possibility of claims arising from Barge ING 4727, and NYMAGIC did not object to H&K's retention. Moreover, NYMAGIC never initiated its own investigation of Barge ING 4727, yet clearly draws much benefit from H&K's earlier investigations. Cf. Transcare N.Y., Inc. v. Finkelstein, Levine & Gittlesohn & Partners, 804 N.Y.S.2d 63, 64 (App. Div. 2005) (noting the failure of the insurer to "investigate the merits of the underlying claim" and stating that "the insurer does not satisfy its duty to defend merely by designating independent counsel to defend the litigation" (internal quotation marks omitted)). In fact, the remaining excess insurers implicitly acknowledge that H&K's investigative services were covered by the primary policy. See AHAC & NACA Reply Br. at 16 (stating that "[Lafarge] violated [the Naming Clause] by unilaterally retaining Goodwin," without mentioning H&K, which they described as "investigative counsel"). We therefore conclude that the fees earned by Goodwin Procter, H&K, and Chaffe, which fees were of the type specifically contemplated under the Expense Clause, are covered under the Protection Clause in light of the circumstances in this case.

That said, the Naming Clause would be rendered a nullity by the Protection Clause if Lafarge's duty to minimize liability permitted it to hire expensive attorneys and establish NYMAGIC's obligation to pay for those attorneys until the end of litigation. While Goodwin Procter, H&K, and Chaffe were reasonably retained to minimize potential liability arising from the extraordinary circumstances here, the Protection Clause does not qualify NYMAGIC's option to name mutually acceptable counsel pursuant to the Naming Clause. The primary policy does not hint of any circumstances where the Protection Clause would trump the Naming Clause, and Lafarge does not point to any language to bring the two provisions into doubt as to their plain meaning in this regard. Thus, once NYMAGIC clearly expressed its intention to fulfill its obligations and offered Lafarge a choice of six qualified law firms, it was incumbent upon Lafarge

27

to act in good faith to consider agreeing to retain a firm from NYMAGIC's list.

Lafarge now asserts various reasons for rejecting NYMAGIC's offered list of firms; however, none of these arguments has merit. Lafarge claims that the firms offered by NYMAGIC were unqualified to defend its interests in the barge litigation because Sutterfield is "only a five-person firm." But NYMAGIC not only offered Sutterfield, but also a list of several law firms composed of between 40 and 160 attorneys specializing in maritime law and experienced in class actions. It was only after Lafarge refused to consider any of these larger firms that NYMAGIC retained Sutterfield to defend Lafarge, which was then already being represented by three large law firms. Moreover, Lafarge's argument is predicated on the unwarranted assumption that a "five-person firm" is less competent than a larger firm or that the "five-person firm" would knowingly fail in its duties to adequately prepare for Lafarge's defense. See La. Rules of Professional Conduct R. 1.1(a) ("A lawyer shall provide competent representation to a client."). There is nothing to suggest that Sutterfield lacks expertise in complex maritime defense or that it would not associate itself with another firm in the absence of Goodwin Procter and Chaffe. Cf. N.Y. Rules of Professional Conduct R. 1.1(b) ("A lawyer shall not handle a legal matter that the lawyer knows or should know that the lawyer is not competent to handle, without associating with a lawyer who is competent to handle it.").

Lafarge also argues that NYMAGIC failed to provide an explanation for rejecting Lafarge's three unauthorized law firms, whose replacement several weeks after their retention would be "nonsensical" and "unreasonable." But this argument is backwards. After being informed of Lafarge's unauthorized retention of three law firms, NYMAGIC offered its own list of firms. Lafarge made no response to the offer and submitted no reasons for rejecting it. NYMAGIC acted consistently with the Naming Clause, while Lafarge breached its duty to consider NYMAGIC's offered list of law firms in good faith. See Nuvest, S.A. v. Gulf & W. Indus., Inc., 649 F.2d 943, 947 (2d Cir. 1981) ("Under both contract law and agency principles, the parties owe each other a duty of good faith."). Indeed, because Lafarge lodged no response

28

to NYMAGIC's offered list of law firms, it seems inappropriate for Lafarge to now complain that NYMAGIC failed to consider the high cost of replacing law firms that had already begun working on Lafarge's defense — an argument that could have been made had Lafarge "consult[ed]" with NYMAGIC regarding "mutually acceptable attorneys" pursuant to the Naming Clause. Moreover, Goodwin Procter and Chaffe would not have been as entrenched and costly to replace had Lafarge informed NYMAGIC of their retention at an earlier time.

Finally, Lafarge argues that NYMAGIC is precluded from exercising its rights under the Naming Clause because a conflict of interest is inherent in Lafarge's relationship with NYMAGIC. Lafarge asserts that because the potential liability at stake in the barge litigation (billions of dollars) is substantially greater than the amount covered by NYMAGIC (approximately $30 million, which includes obligations under both the primary and excess policies), Lafarge was permitted under New York law to retain its own counsel and bill NYMAGIC for that expense under the primary policy. This argument, however, must be rejected, as Lafarge's alleged "conflict" with NYMAGIC is not of the type recognized to confer an independent right on the insured to retain counsel at the insurer's expense.

The New York Court of Appeals has held that "[i]ndependent counsel is only necessary in cases where the defense attorney's duty to the insured would require that he defeat liability on any ground and his duty to the insurer would require that he defeat liability only upon grounds which would render the insurer liable." Pub. Serv. Mut. Ins. Co. v. Goldfarb, 53 N.Y.2d 392, 401 n.* (1981); see also Cunniff v. Westfield, Inc., 829 F. Supp. 55, 57 (E.D.N.Y. 1993); Emons Indus., Inc. v. Liberty Mut. Ins. Co., 749 F. Supp. 1289, 1297 (S.D.N.Y. 1990). Here, both NYMAGIC and Lafarge share a common interest in defeating Lafarge's liability in the barge litigation. Rather than allege a conflict of interest based on different theories of defense affecting the distribution of liability between Lafarge and NYMAGIC, Lafarge asserts its purported conflict on the substantial difference in the amounts at stake in the barge litigation and the amounts that are covered under the primary policy. Lafarge's purported conflict is not a recognized basis for permitting Lafarge

29

to retain independent counsel at the expense of NYMAGIC's primary policy. As the New York Court of Appeals observed:

> [W]here multiple claims present no conflict — for example, where the insurance contract provides liability coverage only for personal injuries and the claim against the insured seeks recovery for property damage as well as for personal injuries — no threat of divided loyalty is present and there is no need for the retention of separate counsel. This is so because in such a situation the question of insurance coverage is not intertwined with the question of the insured's liability.

Goldfarb, 53 N.Y.2d at 401 n.* (emphasis added). Of course, we observe that settlement negotiations may raise a conflict of interest even between an insured and an insurer sharing a common goal of defending against liability, but such a potential or actual conflict is not apparent in this case.[11] Lafarge therefore did not have a right to pursue independent counsel whose legal fees would be covered by the primary policy.

Accordingly, to give full effect to the provisions in the primary policy, we hold that Goodwin Procter's and Chaffe's legal fees are covered under the Protection Clause for amounts incurred by Lafarge prior to, but not including, September 28, 2005, when it became clear that Lafarge was not acting in good faith in considering the list of six qualifying law firms proposed on September 22 by NYMAGIC, and when NYMAGIC advised Lafarge by e-mail that it would not "agree to pay for the three sets of attorneys on the case, none approved by [NYMAGIC]." With respect to H&K, because it was retained on a temporary basis for an investigative mission rather than as defense counsel, and because NYMAGIC "did not commission any investigation of its own into the incident and received full disclosure of the fruits of Lafarge's," Lafarge N. Am., Inc., 598 F. Supp. 2d at 494, the fees earned by H&K are covered in toto under the Protection Clause.

---

[11] To the extent NYMAGIC suggested that Lafarge retain additional attorneys (at Lafarge's own expense) in light of the potential for exposure above the limits of the relevant policies, such a suggestion does not necessarily mean NYMAGIC has a conflict of interest with Lafarge. Indeed, it is encouraged in situations where the potential claims exceed the policy limits to advise the insured of retaining separate counsel. See Nat'l Conference of Lawyers and Liab. Insurers, Am. Bar Ass'n, Guiding Principles II (reprinted in Douglas R. Richmond, Walking a Tightrope: The Tripartite Relationship Between Insurer, Insured, and Insurance Defense Counsel, 73 Neb. L. Rev. 265, 286–91 (1994)); id. at 287 ("[T]he [insurer] retains the exclusive right to control and conduct the defense of the case, in good faith, subject to the right of the insured or such additional attorney to participate.").

E.    Coverage Under the Excess Policy

1.    Coverage Generally

The excess insurers concede that a finding of "simple non-coverage" of Barge ING 4727 under the American Club Policy negates any argument they may have that Lafarge breached its obligation under the excess policy to maintain and keep in full effect the American Club Policy. Because we hold today that summary judgment in favor of the American Club is warranted based on the simple non-coverage of Barge ING 4727 under the American Club Policy, and because there is no dispute that NYMAGIC's primary policy has been exhausted, the excess policy now applies to cover expenses in excess of the primary policy's limits.

2.    Coverage of Lafarge's Unauthorized Legal Expenses

The District Court determined that the excess policy here is a "bumbershoot" policy, which is a type of insurance "intended to fill any coverage gap which might occur when an assured's underlying or primary insurance limits are exceeded, or when underlying insurance covering the risk involved does not exist." Lafarge N. Am., Inc., 598 F. Supp. 2d at 486 (internal quotation marks omitted; emphases added). This determination is supported by the excess policy, which states that it covers "[a]ll Protection and Indemnity risks of whatsoever nature including, but not limited to, those covered by the Underlying Protection and Indemnity insurances"; "General Average, Collision Liabilities, Tower's Liabilities, Salvage, Salvage Charges, and Sue and Labor arising from any cause whatsoever"; and "[a]ll other sums which [Lafarge] shall become legally liable to pay . . . for damages of whatsoever nature" for "[p]ersonal injuries" and "[p]roperty [d]amage." See St. Paul Fire & Marine Ins. Co. v. Bd. of Comm'rs of Port of New Orleans, 646 F. Supp. 2d 813, 818–19 (E.D. La. 2009) (describing the foregoing coverage, in the exact terms, as "considered standard in marine bumbershoot policies"). The excess policy also broadly covers "such expenses as are set out in the definition of 'ULTIMATE NET LOSS'" (the "Loss Clause"), which, in turn, includes "expenses for doctors, lawyers, nurses and investigators and other persons, and for litigation, settlement, adjustment and investigation of claims and suits

31

which are paid as a consequence of any occurrence covered hereunder." And although there is a clause that conditions the excess policy on the proper maintenance of specified primary insurance policies, that clause does not speak to the circumstance where the underlying primary policies are properly maintained but nonetheless do not cover an expense that is otherwise covered by, for example, the Loss Clause. The excess policy is, therefore, a "bumbershoot."

Because the primary policy covers a portion of the legal fees earned by Lafarge's unauthorized law firms, any amount exceeding the primary policy's limit with respect to those expenses is covered by the excess policy.[12] But because the excess policy is also a "bumbershoot," coverage of the portions of the legal expenses not covered under the primary policy is still possible.

Although the excess policy does not include a provision similar to that in the primary policy reserving the insurers the right to name Lafarge's defense counsel, the excess policy does grant the insurers the right to associate with NYMAGIC to defend Lafarge in the barge litigation. Specifically, the provision (the "Assistance Clause") allowing for association provides:

> [The excess insurers] shall have the right and shall be given the opportunity to associate with [Lafarge] or [Lafarge's] Underlying Insurers, or both, in the defense and control of any claim, suit or proceeding relative to an occurrence where the claim or suit involves or appears reasonably likely to involve [the excess insurers] in which event [Lafarge], the Underlying Insurers and [the excess insurers] shall cooperate in all things in the defense of such claim, suit or proceeding.

Relying upon this provision, the excess insurers argue that the excess policy's coverage of legal fees is limited to those covered by the primary policy. But we do not see what the excess insurers imagine is contained in the Assistance Clause that plainly supports their argument. The Assistance Clause does not incorporate the primary policy's Naming Clause. Nor does it adopt the Naming Clause as a limitation on the excess insurers' obligation to pay legal fees. The Assistance Clause simply allows for the excess insurers to associate with either NYMAGIC or

---

[12] The excess policy provides, in part, that "[i]f other valid and collectible insurance with any other Insurer is available to [Lafarge] covering a loss also covered by this Policy, . . . the insurance afforded by this Policy shall be in excess of and shall not contribute with such other insurance."

32

Lafarge, or both, in the defense of qualifying claims, and otherwise requires cooperation among all parties in the common goal of defense. Indeed, this reservation of rights is strong evidence that coverage for fees earned by both counsel, either as excess to NYMAGIC's primary policy or as initial coverage for Lafarge's independent counsel, was intended pursuant to the umbrella coverage provided by the excess policy. That the excess insurers may associate with one counsel does not end their broad obligation to indemnify expenses for other counsel who, at the option of the excess insurers, would have also been associated with the excess insurers' counsel.

Because we conclude that the excess policy is a "bumbershoot" and may cover legal expenses that are not covered by the primary policy, the only limitation to the excess policy's coverage of legal expenses is the general rule that coverage be for <u>reasonable</u> legal expenses — a point of law not in dispute by the parties. See <u>Lafarge N. Am., Inc.</u>, 598 F. Supp. 2d at 497 ("All parties agree that the Insurers are responsible to pay only the 'reasonable' fees and costs of attorneys."). In this regard, although we reject the excess insurer's construction of the Assistance Clause, we agree that Lafarge's retention of Goodwin Procter and Chaffe in open defiance of the plain terms of the Naming Clause of the primary policy was unreasonable. The excess policy specifically requires the primary policy to be maintained in full effect; the excess insurers therefore reasonably expected Lafarge's defense counsel to be selected pursuant to the plain terms of the primary policy. Moreover, while it may have been reasonable for Lafarge to retain its own attorneys to protect against any remote potential conflicts of interest between the insurers and Lafarge, the continued retention of Goodwin Procter and Chaffe goes well beyond the necessity of filling that modest role. Accordingly, we conclude that the excess policy does not cover the fees and expenses claimed by Goodwin Procter and Chaffe on or after September 28, 2005.

F.      Legal Fees in Connection with Motions Before the District Court

Attorneys' fees awards in admiralty suits are discretionary and ordinarily require a finding of bad faith. See <u>Ingersoll Milling Mach. Co. v. M/V Bodena</u>, 829 F.2d 293, 309 (2d Cir. 1987). In denying a motion for attorneys' fees, the District Court may also consider, <u>inter alia</u>, the

33

relevant state rule, here, New York, and, as well, the status of the party moving for fees, i.e., whether the movant is a prevailing party. See N.Y. Marine & Gen. Ins. Co. v. Tradeline (LLC), 266 F.3d 112, 130 (2d Cir. 2001). The District Court in this case denied Lafarge's motion for attorneys' fees because: (1) under New York law, Lafarge would not be entitled to attorneys' fees, and (2) Lafarge only partially prevailed in defending against the insurers' summary judgment motions. In light of our holdings today, Lafarge cannot claim error with respect to the District Court's latter conclusion.

"Under New York law, it is well settled that an insured cannot recover his legal expenses in a controversy with a carrier over coverage, even though the carrier loses the controversy and is held responsible for the risk." Employers Mut. Cas. Co. v. Key Pharms., 75 F.3d 815, 824 (2d Cir. 1996) (internal quotation marks omitted). A "narrow exception" to this rule applies, Liberty Surplus Ins. Corp. v. Segal Co., 420 F.3d 65, 67 (2d Cir. 2005) (per curiam) (internal quotation marks omitted), when an insured is "cast in a defensive posture by the legal steps an insurer takes in an effort to free itself from its policy obligations, and who prevails on the merits," U.S. Underwriters Ins. Co. v. City Club Hotel, LLC, 3 N.Y.3d 592, 597 (2004) (internal quotation marks omitted). Although the exception appears broadly applicable to insurers attempting to escape any policy obligation, we have held that the insured is entitled to attorneys' fees only if the insured prevails in a dispute over the insurer's attempt "to free itself" from its "duty to defend." Liberty Surplus Ins. Corp., 420 F.3d at 67–68.

Here, NYMAGIC does not contest its duty to defend Lafarge in the barge litigation. Indeed, NYMAGIC concedes that it has such a duty, and has accordingly offered a list of attorneys for Lafarge's defense, assigned Sutterfield to Lafarge's defense after Lafarge unreasonably rejected NYMAGIC's offered list of attorneys, and continues to pay for Sutterfield and other related expenses. Similarly, although AHAC and NACA quibble with the order in which they should pay for Lafarge's defense, neither insurer denies that it has a duty to pay for Lafarge's legal expenses insofar as those expenses exceed the primary policy. More importantly,

34

AHAC and NACA adopt NYMAGIC's position with respect to coverage under the primary policy and do not contest NYMAGIC's duty to defend Lafarge in the barge litigation. In essence, the insurers here only challenge their obligation to pay for Lafarge's firms, which were retained without NYMAGIC's knowledge or consent and in contravention to the Naming Clause of the primary policy. NYMAGIC is asserting its right under the Naming Clause to defend Lafarge. Accordingly, because the insurers do not attempt to avoid their duty to defend Lafarge, the District Court's conclusions regarding New York law were not in error.

We therefore conclude that the District Court did not abuse its discretion. The District Court's underlying reasons for denying Lafarge's motion for attorneys' fees were sufficient and without error.

**III.   CONCLUSION**

We have considered the remaining arguments made by the parties and find them to be either without merit or unnecessary to address in light of our holdings in this opinion. For the foregoing reasons, the judgment of the District Court is AFFIRMED in part, VACATED in part, and REMANDED for further proceedings not inconsistent with this opinion.